**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-2734
_____

JANE DOE,
               Appellant

v.

MERCY CATHOLIC MEDICAL CENTER
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-15-cv-02085)
District Judge: Honorable Michael M. Baylson
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 23, 2021
Before: JORDAN, MATEY and NYGAARD, Circuit Judges

(Opinion filed: March 25, 2021)
_____

OPINION*
_____

PER CURIAM

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Jane Doe[1] appeals from an order of the United States District Court for the Eastern District of Pennsylvania, which granted Mercy Catholic Medical Center's ("Mercy") motion for summary judgment. We will affirm the District Court's judgment.

I.

The parties are familiar with the facts of the case and its long history, including a previous appeal to this Court. See Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545 (3d Cir. 2017). Doe was a radiology resident at Mercy from July 2011 until April 2013. Doe alleges that Roe constantly followed her around, told her he loved her, and suggested they take trips together. She also alleged that Roe was "constantly erected" and once touched her breast. Her complaint alleges that Mercy terminated her residency in retaliation, and as "quid pro quo" discrimination, because she refused Roe's advances. We will discuss incidents during her residency that are particularly pertinent to our decision.[2]

---

[1] The District Court allowed Doe to proceed under a pseudonym. Her suit referred to her alleged harasser, the director of Mercy's residency program, as Dr. James Roe.

[2] As explained below, we view the facts in the light most favorable to Doe. But Doe's Statement of Undisputed Facts, Dkt. #116-2, in many cases cites only to her Declaration, which at the time of filing was unsworn and not made under penalty of perjury. See United States ex rel. Doe v. Heart Solution, PC, 923 F.3d 308, 315 (3d Cir. 2019) (explaining that a court may consider an unsworn declaration on summary judgment only if it is made under penalty of perjury). Doe later moved to correct her Declaration to show that it was made under penalty of perjury. Dkt. #131. The motion requested five days to submit an executed copy of the Declaration, which was included as an unsigned exhibit (Exhibit A) to the motion. Id. The District Court did not require Doe to file a signed version, as it was granting Mercy's summary judgment motion. Dist. Ct. Op., Dkt. #135 at 4 n.2. As we are affirming the District Court's decision, we too will overlook the lack of a declaration signed under penalty of perjury. And like the District Court, we will rely on Doe's Declaration only to the extent that it is not contradicted by

A.     Email in October 2011

Doe sent Roe an email in October 2011, stating that other attending physicians and residents were "getting the feeling that there is something between us." Roe brought the email to the attention of residency program coordinator, Meggan Drake. Drake set up a meeting with Doe and Roe. When confronted with the email, Doe denied that anything was going on between her and Roe, and she apologized for sending the email.

B.     Text messages in November 2011

Doe sent Roe four text messages just before and during the time the two were at a conference in Chicago: (1) November 27, 2011–"Would you like to meet me at my motel?"; (2) November 29, 2011–"I do understand, I will support and follow you. But i [sic] will just wait for 3 years. At the end of 3 years, you will see...."; (3) November 30, 2011–"If you want to punish me for loving you, do it, it can not [sic] hurt more after seeing your eyes. I am em [sic]"; (4) November 30, 2011–"I am humiliated enough for being [sic] an unwanted position and will never be there again." SUMF ¶ 49. Roe did not respond. Instead, he reported Doe's text messages to Dr. Eiser, Mercy's Vice President of Medical Education, and upon returning to Philadelphia, forwarded all the texts to Human Resources. Doe admitted in her deposition that she had romantic feelings towards Roe at the time, but

---

the record. See id. n.3 (explaining that the Court would not credit statements in Doe's Declaration that contradicted her deposition testimony or were "otherwise belied by the evidentiary record" (citing Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)); see also Fed. R. Civ. P. 56(c), (e).

she also testified that Roe said he loved her, he wanted to eventually marry her and have children with her, and that her texts were intended to "let him down easy." Declaration of Jane Doe, Dkt. #131, Exh. A ¶ 31. Doe was asked to meet with Human Resources. She admitted sending the texts to Roe and apologized for them. She testified that she informed Human Resources that she had sent the text messages because she was trying to stop Roe's "romantic advances, personal advances," and that Roe's "sexual advances w[ere] creating an unhelpful environment for [her] training." SUMF ¶¶ 62-63 (alterations in original). Human Resources suggested that she could meet with the Employee Assistance Program ("EAP"). Doe alleges that she also told Dr. Keren Sofer of the EAP that Roe's "extreme personal appreciation and attention" was "creating hostile work environment" for her. SUMF ¶ 69. Dr. Sofer's notes for the sessions do not reflect such a statement. Instead, the notes state that Doe reported "sen[ding] her program director [Roe] a text expressing her romantic interest in him and he brought this to HR. [Doe] feels the interest was mutual. Feels hurt and embarrassed." SUMF ¶ 72.

    C.    <u>Doe reacts to recommendations</u>

In January 2013, Doe reacted angrily when she believed that Roe and Dr. Stanley Chan[3] gave her bad recommendations for a neuroradiology fellowship that she planned to pursue at Johns Hopkins following her residency at Mercy. The doctors' letters, addressed

---

[3] From December 2011 to February 2013, Doe worked under the supervision of Dr. Chan, who completed all of her evaluations during her residency.

to Dr. Nafi Aygun at Johns Hopkins, lacked any negative information about Doe.[4] But after receiving the letters, Dr. Aygun decided to call Dr. Roe because he believed Roe's letter lacked information about Doe's clinical abilities. In the telephone call, Roe gave Dr. Aygun the impression that Doe's clinical performance was "subpar," but Dr. Aygun explained that he still intended to accept Doe into the fellowship. SUMF ¶ 101. Dr. Aygun called Doe to congratulate her on receiving the fellowship, but apparently also conveyed to Doe that Roe had mentioned that she had some clinical deficiencies.

Doe called Roe, who was working at the hospital that Saturday, and angrily complained about his recommendation. Doe testified that Roe told her he did it to teach her a lesson and then he hung up on her. Doe repeatedly tried to call Roe, who told her that she was disrupting patient care. Roe reported Doe's behavior to Dr. Eiser. The next day, Doe called Roe at work again and emailed him several times, demanding to have an immediate conversation. Roe again informed Doe that she was interfering with patient care, but she said that her concerns were more important than patient care.

On the following Monday morning, Doe met Roe in the hallway, in a disheveled and agitated state, and again confronted him about the recommendation. Roe told her to report to her assigned conference and that he would meet with her later in the day. Doe refused to leave and stated that she could not provide patient care because she had not slept or eaten for two days. Doe followed Roe into Drake's office, stating that she would not

---

[4] Doe did not see the letters during her residency.

leave until Roe spoke with her. Roe then called Dr. Eiser, who scheduled a meeting with Doe for 10:30 that morning. At the meeting, Doe demanded that Roe and Dr. Chan do something to correct the injury to her career.[5] Dr. Eiser required Doe to undergo a psychiatric evaluation in order to continue her residency. Although she at first refused, she later agreed to be seen by Mercy's Chair of Psychiatry that afternoon. The psychiatrist cleared her to return to work in two days.

Drs. Roe, Chan, and Eiser met with Doe on her return to work on February 27 and informed her that she was required to follow a remediation process and that any further unprofessional behavior would lead to her suspension. Doe refused to sign the remediation plan, but the three doctors decided to allow her until March 3 to reconsider. Doe emailed Drs. Roe and Chan on March 1, stating that she was having problems with her "professional insight during her residency" and that she realized the doctors' "intention was to help me and improve me." SUMF ¶¶ 161-62. She signed the remediation plan on March 4. In her deposition, Doe acknowledged that her behavior complaining about the recommendations was unprofessional. SUMF ¶ 164. The remediation plan provided, in part, Mercy's expectation that in the future, Doe would have "No emotional outbursts and inappropriate

---

[5] Although not supported by Mercy's contemporary documentation of the meeting, Doe alleges that the meeting was mostly about Roe's sexual harassment and that she told the meeting participants that Roe was "constantly erected whenever [she] was around." SUMF ¶¶ 138-39.

communication towards [Dr. Roe], [Dr. Chan], or other member of the residency or Mercy staff . . . ." SUMF ¶ 166.

### D. Doe's reaction to having her name removed from project

Doe's agreement to refrain from emotional outbursts lasted about a month. On April 10, Roe reviewed an abstract submitted by another resident, Reza Hayeri, and noted that Doe's name had been added as a co-author. Roe asked Hayeri why Doe's name was on the abstract. Hayeri responded that he had asked her to help him with the project. Roe asked Hayeri if Doe had made any substantive contributions yet, and he replied that she had not. Roe asked Hayeri to remove Doe's name because he wanted her to focus on clinical practice rather than research.

When Hayeri told Doe that her name had been removed, Doe angrily went to confront Roe. Roe was on a conference call with another doctor, but Doe refused to follow Roe's instructions to wait for him in Drake's office. Doe grabbed a piece of paper, signed it, and said that she was leaving. Roe walked towards Dr. Eiser's office and Doe followed him, continuing to yell that she was leaving. Drs. Roe and Eiser met privately and decided that they should determine whether Doe was resigning and that if she was not, they would immediately suspend her for unprofessional behavior, as she had violated her remediation plan. Doe had left, but they invited her back to Dr. Eiser's office, where she continued to complain that Roe was "blocking [her] career" and that he must be "getting some pleasure from torturing [her]." SUMF ¶ 201. Doe did not comply with requests to calm down. Dr.

Eiser asked Doe if she intended to resign, but she stated that she would like to finish her residency. Doe was then suspended and asked to leave the hospital grounds. Mercy sent her a letter explaining that she could appeal her suspension.

Doe then sent Roe and Pamela Fierro, Mercy's Administrative Director of Graduate Medical Education, several emails following her suspension. Many emails apologized for her unprofessional behavior, stating that she "acted completely wrong," or "acted childhood." SUMF ¶ 214.

### E. Doe's termination/resignation

Doe appealed her suspension on April 12, but Drs. Eiser and Roe decided to terminate Doe's residency. Doe received a letter from Mercy on April 19, 2013, explaining the reasons for her termination. On April 24, Doe attended a hearing at Mercy about her termination. Doe did not make any allegations of sexual harassment at the hearing or in the written statement that she presented to the hearing committee. Doe apologized in her written statement for her unprofessional actions, but the hearing committee affirmed the termination decision. Doe was told that she could appeal, but Dr. Eiser advised her to consider resigning instead, which might allow her to pursue another residency. Doe took that advice and resigned on May 1, 2013. Doe was unable to secure another residency, which precluded her from gaining Board certification.

II.

On April 20, 2015, Doe sued Mercy. The District Court granted Mercy's motion to dismiss and Doe appealed. In that appeal, we held, as a matter of first impression, that Doe could "bring private causes of action for sex discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, against Mercy Catholic Medical Center, a private teaching hospital operating a residency program." Doe, 850 F.3d at 549. We thus vacated the District Court's dismissal of Doe's Third Amended Complaint ("TAC") as to Doe's claims of retaliation and quid pro quo sexual harassment under Title IX and remanded for further proceedings. We noted that only conduct that occurred on or after April 20, 2013, fell within the two-year period of limitations for such claims; namely, "Mercy's decision to dismiss [Doe] by letter dated April 20, 2013 and Dr. Roe's advocating for her dismissal at her appeal hearing on April 24, 2013." Id. at 564 (discussing Doe's retaliation claim); see also id. at 566 (naming same two incidents as meeting the time limit for Doe's quid pro quo claim).[6] But we agreed with the District Court that Doe's hostile environment claim was untimely. Id. at 566.[7]

---

[6] The parties later learned in discovery that Doe received her termination letter, (actually dated April 19, 2013) on that same day. Doe testified at her deposition that she had learned of her termination in a telephone call on April 12, but she later argued that her testimony was mistaken and that she only discussed her suspension in that call. The District Court determined that if one credited Doe's allegation that she first learned of her termination on the 19th, her complaint, filed on Monday, April 20, 2015, would be timely as to claims based on her termination. Dist. Ct. Op., Dkt. #135 at 21 (citing Fed. R. Civ. P. 6(a)(1)(C)). We agree.

[7] We also reversed the District Court's dismissal of Doe's state law claims to allow the District Court to decide whether to exercise supplemental jurisdiction. Id. at 567. On remand, however, the parties stipulated to the dismissal of the state law claims.

9

Mercy sought summary judgment on Doe's remaining claims: her quid pro quo claim under Title IX and her retaliation claim under Title IX. After further briefing on both sides, and a limited oral argument, the District Court granted the motion for summary judgment and Doe appealed. Although counsel represented Doe in the District Court and initially on appeal, her appellate attorneys withdrew their representation. Doe is now proceeding pro se.[8]

### III.

We have jurisdiction under 28 U.S.C. § 1291. "We review the District Court's grant of summary judgment de novo." Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 288 (3d Cir. 2018). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Turco v. City of Englewood, 935 F.3d 155, 161 (3d Cir. 2019).

A.     Retaliation

---

Dkt. #52. Over a year later, Doe tried to reinstate the state law claims by amending her complaint for a fourth time, but the District Court denied her motion to amend. Dkt. #129 (order); Dkt. #140 (memorandum and/or opinion). Doe filed a separate notice of appeal from the District Court order denying her motion to file a fourth amended complaint. Dkt. #138. But because she did not challenge that order in her opening brief, any challenges to that order are forfeited. See Bowers v. NCAA, 475 F.3d 524, 535 n.11 (3d Cir. 2007).

[8] We discuss her motion for appointment of counsel in footnote 15.

In our previous opinion, we explained what Doe would need to show to prevail on her retaliation claim, as set forth in the margin.[9] For purposes of summary judgment, Mercy did not dispute that Doe stated, at an April 10, 2013 meeting to discuss her behavior of that day, that Roe was sexually harassing her. That statement would constitute protected activity. Doe's termination, which happened (at the latest) nine days later, is an adverse action.[10] And although Mercy argued that Doe had not shown causation, we agree with

---

[9] We stated:

> [T]o establish a *prima facie* retaliation case under Title IX, Doe must prove she engaged in activity protected by Title IX, she suffered an adverse action, and there was a causal connection between the two. Cf. Moore v. City of Philadelphia, 461 F.3d 331, 340–42 (3d Cir. 2006). If she makes this showing, the burden shifts to Mercy to advance a legitimate, nonretaliatory reason for its conduct. Id. at 342. If Mercy does so, Doe must show that Mercy's proffered explanation was false and that retaliation was the real reason for the adverse action against her. Id.

Doe, 850 F.3d at 564.

[10] Doe asserted three other possible "adverse actions" in the District Court. Her brief here addresses the three in a cursory manner. See Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist., 877 F.3d 136, 145 (3d Cir. 2017) (providing that an issue is forfeited unless it is raised in an appellant's opening brief). But even if Doe had not forfeited her argument, we agree with the District Court that Doe could not rely on three other purported "adverse actions." First, Doe has not shown causation—she does not explain how her appeal hearing would have been any different had she not engaged in protected activity on April 10. In other words, she has not provided any evidence that her termination would have been overturned if she had not complained of harassment. Second, Dr. Eiser's advice to Doe to resign rather than pursue further appeals, to help her possibly get another residency position, was not adverse to Doe. Finally, Doe could not rely on post-termination letters to credentialing authorities in which Dr. Roe truthfully reported Doe's suspension and later resignation, as she did not mention those actions in her TAC. Plaintiffs "should not be able effectively to amend a complaint through any document short of an amended pleading." Grayson v. Mayview State Hosp., 293 F.3d

11

the District Court that the temporal proximity between the April 10 meeting and Doe's termination allowed an inference of causation for Doe's prima facie case. See Starnes v. Butler Cty. Court of Common Pleas, 50th Judicial Dist., 971 F.3d 416, 430 (3d Cir. 2020).

The burden then shifted to Mercy to show that it terminated Doe for a "legitimate, non-discriminatory reason." Doe, 850 F.3d at 564. Mercy outlined the reasons for Doe's termination in the April 19, 2013 letter, including Doe's unprofessional emails and text messages in October and November 2011, her unprofessional conduct when complaining about recommendations in February 2013, and her unprofessional behavior after learning that her name had been removed from an abstract. SUMF ¶ 222. The letter added that Doe also had "repeatedly produced imaging reports" that were not up to Mercy's standards and that Mercy had "received multiple complaints from faculty members" about her work product. SUMF ¶ 222. Mercy's explanation that Doe had violated professionalism standards under her residency contract and Mercy's policies, and that her conduct violated standards of the Accreditation Council for Graduate Medical Education, is facially legitimate and nondiscriminatory. See In re Tribune Media Co., 902 F.3d 384, 402 (3d Cir. 2018) (violating employer's policies may be a legitimate and non-discriminatory reason for adverse action).

The burden then shifted back to Doe to "show that Mercy's proffered explanation was false and that retaliation was the real reason for the adverse action against her." Doe,

---

103, 109 n.9 (3d Cir. 2002).

850 F.3d at 564. The District Court noted that Doe did not argue that Mercy's reasons were pretextual, except to briefly argue at oral argument that evidence in support of a prima facie case may also be used to show pretext. Dist. Ct. Op., Dkt. #135 at 28 (discussing Doe's citation of Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000)). Doe did note, in connection with establishing her prima facie case, that Mercy's termination letter added a new reason for her termination; namely, her insufficient work product. One might argue that adding this new ground is evidence of pretext. But the undisputed evidence shows that Doe was subject to a remediation plan because of her admittedly unprofessional conduct in February 2013, before she made her complaint of harassment in April. And she was terminated for admittedly acting unprofessionally once again, in violation of her remediation plan. That the letter also mentions her work product does not negate Mercy's contention that it terminated her for her unprofessional conduct. Cf. Ross v. Gilhuly, 755 F.3d 185, 194 (3d Cir. 2014) (noting that "[a]n employee cannot easily establish a causal connection between his protected activity and the alleged retaliation" when he was notified of not meeting employer's requirements before engaging in the protected activity).

Doe argues that she only admitted that her conduct was unprofessional so that she could keep her residency. But Mercy could reasonably rely on Doe's admissions as a basis for terminating her. Doe has not shown that there is any genuine issue of material fact as to whether Mercy's termination decision was pretextual. See In re Tribune Media Co., 902

13

F.3d at 403 (explaining that plaintiff had not shown pretext where he admitted to engaging in conduct barred by employer's policies); Moore, 461 F.3d at 342 ("[T]he plaintiff must be able to convince the factfinder *both* that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." (emphasis added; internal quotation marks and citation omitted)).

    B.    Quid pro quo

We agree with the District Court that Doe did not establish a prima facie case of quid pro quo discrimination because she failed to establish causation.[11] Doe's vague references to Roe "constantly" making sexual advances during her residency, with no further detail (what kind of advances? when?), do not support an inference that she was terminated because she failed to acquiesce to Roe's advances.

Doe did allege at deposition that on one occasion between February and April 2013, Roe touched her breast and that Roe and the other doctor in the room laughed. But without

---

[11] We explained in our prior opinion that:

> [U]nwelcome sexual advances, requests for sexual favors, or other verbal or physical actions of a sexual nature constitute *quid pro quo* harassment when (A) the plaintiff's submission to that conduct is made either explicitly or implicitly a term or condition of her education or employment experience in a federally-funded education program, or (B) submission to or rejection of that conduct is used as the basis for education or employment decisions that affect the plaintiff.

Doe, 850 F.3d at 565.

a more specific date,[12] or other evidence tying this incident to her termination, Doe has not submitted evidence to support a causal link for purposes of her prima facie case of quid pro quo harassment.[13]

IV.

We next address several issues Doe raises in her briefs. First, Doe argues that although the District Court denied her motion to reinstate her contract claims, the District Court should have considered those claims in connection with her Title IX claims. As Doe did not raise that argument in the District Court, it is forfeited. See In re Reliant Energy Channelview LP, 594 F.3d 200, 209 (3d Cir. 2010).

Doe also argues in her brief that Mercy violated due process in the way that it handled her claims of sexual harassment and her termination. In a similar context, we have held that "the basic elements of federal procedural fairness in a Title IX sexual-misconduct proceeding include a real, meaningful hearing and, when credibility determinations are at issue, the opportunity for cross-examination of witnesses." Doe v. Univ. of Scis., 961 F.3d 203, 215 (3d Cir. 2020). Although Doe has complained of how long she had to prepare for

---

[12] Doe states in her brief here that the incident was necessarily after March 21, 2013, perhaps because her Declaration labels the incident as happening in "Spring." But her deposition testimony does not support that narrowing of the timeframe.

[13] And even if we were to determine that she had established a prima facie case, Mercy has proffered legitimate, nondiscriminatory, and non-pretextual reasons for her termination. See Farrell, 206 F.3d at 286 n.11 (assuming without deciding that the typical burden-shifting framework of discrimination cases applies to quid pro quo claims).

a hearing, and the composition of the panel reviewing the termination decision, she has not presented a genuine issue of material fact as to whether she was provided basic due process, particularly since she admitted to and apologized for the conduct for which she was terminated.

Doe also complains about "spoliation of evidence" and "fraud on the court" in her brief here, but those issues are also forfeited, as she did not properly raise them in the District Court.[14] In re Reliant Energy Channelview LP, 594 F.3d at 209. For the same reason, we cannot entertain her claims, raised for the first time in her reply brief: (1) that Mercy is engaging in "continuous retaliation," which is causing a "hostile work environment at Appellant's current employment," Reply Brief at 6-7; (2) vague claims that her "constitutional rights" and "civil rights" have been violated, Reply Brief at 7-8; and (3) claims of "criminal conspiracy," and violation of various statutory provisions prohibiting fraud, including health care fraud. See also Gambino v. Morris, 134 F.3d 156, 161 n.10 (3d Cir. 1998) (explaining that we will not consider claims raised for the first time in a reply brief).

V.

---

[14] Doe argues in her reply brief that she mentioned fraud and spoliation in her deposition, but that was not a proper way to bring the issues to the attention of the District Court. See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 262 (3d Cir. 2009) (explaining that a "fleeting reference or vague allusion to an issue" does not sufficiently alert the District Court to the issue and does not preserve the issue for appeal).

For all of these reasons, we will affirm the District Court's judgment.[15]

---

[15] Several motions remain outstanding. First, we deny Doe's motions for appointment of counsel, App. Dkt. ##69, 71, 72. Doe does not financially qualify for appointment of counsel, see 28 U.S.C. § 1915(e)(1), and we conclude that appointment of counsel is not necessary here, see generally Tabron v. Grace, 6 F.3d 147, 155 (3d Cir. 1993).

Next, we address the parties' motions for filing certain documents under seal. There is a strong presumption that the public may view judicial records. To overcome this presumption, the moving party must show that "the material is the kind of information that courts will protect" and that "disclosure will work a clearly defined and serious injury." In re Cendant Corp., 260 F.3d 183, 194 (3d Cir. 2001) (internal quotation marks and citation omitted). A "motion to seal must explain the basis for sealing and specify the desired duration of the sealing order." L.A.R. Misc. 106.1(a).

Doe moves to seal her affidavit in support of her motion to proceed in forma pauperis, App. Dkt. #70. She argues that because the affidavit "contains information, about social security number, and dependent minor, allowing access would harm privacy interest." But Doe has not been asked to do anything more than Congress saw fit to require of all applicants seeking in forma pauperis status in the federal courts when it enacted § 1915. We also note that remote access to electronic filings containing personal information is limited. See Fed. R. App. P. 25(a)(5); Fed. R. Civ. P. 5.2(c). That said, while we deny the motion to file the affidavit under seal, Doe may, within 14 days of the date of this decision, file a version of the affidavit that redacts her name, the name of her minor child, and the last four digits of her social security number. The affidavit will remain under seal until those 14 days have elapsed.

Doe's motion to file the Appendix under seal, App. Dkt. #67, is granted, as it consists of documents that reveal the true names of Doe and Roe and documents that reveal protected medical information. The Appendix will be sealed for 25 years. See 3d Cir. L.A.R. Misc. 106.1(c). For the same reasons, we grant Mercy's motion, App. Dkt. #82, to file under seal Volumes IV-VI of the Supplemental Appendix, but we deny its motion to the extent that it requests indefinite sealing. Volumes IV-VI of the Supplemental Appendix will be sealed for 25 years. Id.

Finally, we will address Doe's Motion to Request Protection from Appellee, App. Dkt. #76, Mercy's response thereto, App. Dkt. #78, and Doe's reply, App. Dkt. #79. Doe's motion is denied. To the extent that we have jurisdiction to grant some form of relief, none is warranted, given our disposition of Doe's appeal.